1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9                     CENTRAL DISTRICT OF CALIFORNIA

10

11

12   ARACELIA URIBE,                    )   Case No. CV 13-8178-KK
                                        )
13                    Plaintiff,        )
                                        )   MEMORANDUM AND ORDER
14        v.                            )
                                        )
15   CAROLYN W. COLVIN, Acting          )
     Commissioner of Social Security,   )
16                                      )
                      Defendant.        )
17   _____)

18        Plaintiff Aracelia Uribe seeks review of the final decision of the Commissioner of

19   the Social Security Administration ("Commissioner" or "Agency") denying her

20   application for Title II Disability Insurance Benefits ("DIB").  The parties have

21   consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant

22   to 28 U.S.C. § 636(c).  For the reasons stated below, the Commissioner's decision is

23   AFFIRMED.

24   ///

25   ///

26   ///

27   ///

28

                                        1

1

**I.**

2

**PROCEDURAL BACKGROUND**

3    On October 6, 2010, Plaintiff submitted an application for DIB.  Administrative

4 Record ("AR") at 133.  On July 26, 2011, the Agency denied the application.  Id. at 58.

5    On August 23, 2011, Plaintiff requested a hearing before an Administrative Law

6 Judge ("ALJ").  Id. at 72.  On March 14, 2012, a hearing was held before ALJ Joel B.

7 Martinez.  Id. at 23.  On June 12, 2012, a followup hearing was held.  Id. at 53.  On July

8 27, 2012, the ALJ issued a decision denying Plaintiff's application.  Id. at 10.

9    On September 10, 2012, Plaintiff asked the Agency's Appeals Council to review

10 the ALJ's decision.  Id. at 5.  On September 6, 2013, the Appeals Council denied

11 Plaintiff's request for review.  Id. at 1.

12    On November 5, 2013, Plaintiff filed the instant action.  This matter is before the

13 Court on the parties' Joint Stipulation ("JS"), filed November 20, 2014, which the Court

14 has taken under submission without oral argument.

15

16

**II.**

17

**RELEVANT FACTUAL BACKGROUND**

18    Plaintiff was born on November 30, 1969, and her alleged disability onset date

19 ("AOD") is December 20, 2006.  Id. at 133.  Plaintiff alleges disability based upon

20 fibromyalgia, "spondolidis,"[1] back pain, sciatica, stiffness and pain in her neck, and

21 stiffness and pain in her pelvis area.  Id. at 150.  Plaintiff was 37 years old at the time of

22 the AOD, and 42 years old at the time of the hearings before the ALJ.  Plaintiff

23 completed the eleventh grade, and last worked in December 2006 as a supervisor at a

24 factoring company.  See id. at 26, 28-30.

25

26

27

28

---

[1] The Court believes this word refers to ankylosing spondylitis ("AS"), which is spelled differently throughout the record, including as "spondylosis."

2

**A.     Treating Sources**

**1.     Kaiser Permanente**

Plaintiff was treated at Kaiser Permanente from January 2006 through December 2006.  On October 16, 2006, Plaintiff rated the pain level in her neck as a four to five out of ten; the pain level in her mid-back as a five out of ten; and the pain in her lower back as a five out of ten.  Id. at 276.  On October 18, 2006, a doctor noted Plaintiff was "[d]eemed nonsurgical candidate for the lower back pain."  Id. at 271.  On December 1, 2006, Plaintiff reported that her pain level was three out of ten.  Id. at 266.

On December 20, 2006, Plaintiff was treated by Kaiser employee Dr. Linda Atkinson.  Id. at 255.  Plaintiff was referred to Dr. Atkinson for "chronic neck and back pain."  Id.  According to Dr. Atkinson's report, Plaintiff "was told in the past that she may have" ankylosing spondylitis ("AS").  Id.  Dr. Atkinson summarized Plaintiff's reporting of her problems as follows:

> [Plaintiff] reports that she has had back pain since her teens.  She reports having severe pain since 2000 that radiated down her leg.  She had a laminectomy in 2000 which caused temporary relief for six months.  She reports that since then she had gotten temporary relief with epidural injections.

Id. at 255.

Dr. Atkinson stated she did not "find evidence of AS when I viewed [Plaintiff's] lumbo sacral xrays."  Id. at 260.  However, Dr. Atkinson referred Plaintiff for a test to see if Plaintiff has the HLA-B27 antigen, which "is seen with a frequency of 90 percent in patients with" AS.  Id. at 260-61.  The test determined Plaintiff has the antigen.  Id. at 261.

Dr. Atkinson stated that Plaintiff had "enough tender points to qualify for a diagnosis of fibromyalgia.  Regular exercise including pool exercises was encouraged."  Id. at 260.

2.    **Dr. Randolph J. Betts**

In a report dated July 8, 2008, Dr. Randolph J. Betts, a family medicine practitioner who treated Plaintiff, stated Plaintiff "has seen all specialists – who all advise [no] surgery." Id. at 384.  Dr. Betts diagnosed Plaintiff with "mild spondylosis only," along with sciatica and chronic pain syndrome.  Id. at 384, 387-88; see also id. at 479 ("[Plaintiff] was diagnosed with fibromyalgia and possible early ankylosing spondylitis.").

3.    **Dr. Kaleem Uddin**

In a report dated February 25, 2008, Dr. Kaleem Uddin, a neurologist whom Dr. Betts asked for a second opinion, stated that a "recent MRI of [Plaintiff's] lumbosacral spine" was "completely normal," with "no evidence of disk herniation" and "no evidence of arthritic changes." Id. at 425-26.  Dr. Uddin stated Plaintiff's "examination and history is highly suggestive of fibromyalgia." Id. at 426.  Dr. Uddin suggested Plaintiff "stop doing any surgical intervention or any epidural steroid injection," and instead go to "a rheumatologist so that she can be treated for fibromyalgia." Id.

B.    **Consultative Sources**

1.    **Dr. Nahel Al Bouz**

On July 14, 2011, Plaintiff received a consultative examination by Dr. Nahel Al Bouz.  Id. at 477.  After physically examining Plaintiff, Dr. Bouz offered the following impression:

> This is a 41-year-old female who presents with symptoms suggestive of fibromyalgia, history of sciatica with laminectomy, with temporary improvement and then worsening again.  The claimant did not have any signs of muscle wasting on her physical examination.  She had full range of motion of all her joints except for the C-spine, which had limited range of motion on flexion with pain in bilateral paraspinal areas, but there is no spine tenderness to palpation.

Id. at 481-82.  Dr. Bouz stated Plaintiff "is able to walk without difficulties," on both her

4

1  toes and heels, and did not use an assistive device.  Id. at 481.

2      Based on Plaintiff's history and the findings of the physical examination, Dr. Bouz

3  found Plaintiff could push, pull, lift, and carry "50 pounds occasionally and 25 pounds

4  frequently"; could walk and stand "6 hours out of an 8-hour work shift"; did not need an

5  "assistive device"; had no sitting restrictions; "has postural limitations towards squatting,

6  bending, and stooping to only frequent due to her low back pain and sciatica type pain";

7  "should avoid unprotected heights due to her low back pain"; had no sight or hearing

8  restrictions; and had no restrictions on using "the hands for fine and gross manipulative

9  movements."  Id. at 482.

10

11      **2.    Dr. Elva Montoya**

12      In a Physical Residual Functional Capacity Assessment dated July 22, 2011, Dr.

13  Elva Montoya found, after reviewing "all evidence" in Plaintiff's file, that Plaintiff could

14  "[o]ccasionally lift and/or carry" 50 pounds; could "[f]requently lift and/or carry" 25

15  pounds; could "[s]tand and/or walk (with normal breaks) for a total of about 6 hours in

16  an 8-hour workday"; could "[s]it (with normal breaks) for a total of about 6 hours in an

17  8-hour workday"; had no "[p]ush and/or pull" limitations, "other than shown for lift

18  and/or carry"; had frequent limitations with regard to climbing, stooping, kneeling,

19  crouching, and crawling; had no limitations with regard to balancing; was occasionally

20  limited with regard to overhead reach; had no limitations with regard to handling,

21  fingering, and feeling; had no visual limitations; had no communicative limitations; and

22  should avoid "unprotected heights due to low back pain."  Id. at 484-86.  Dr. Montoya

23  stated that her findings were not "significantly different" from "treating/examining

24  source conclusions about the claimant's limitations or restrictions."  Id. at 487.

25

26      **3.    Dr. Sarah L. Maze**

27      On April 20, 2012, Plaintiff received a neurological evaluation by Dr. Sarah L.

28  Maze.  Id. at 507.  Dr. Maze found Plaintiff has a "fair" general fund of knowledge; (2)

"recalls three out of three items at one and five minutes"; "stands promptly from a seated position and walks in a stable manner"; has intellectual functioning that "appears to be in the normal range"; does not have reduced concentration; "is able to occasionally lift 50 pounds and frequently lift 25 pounds"; "is able to stand and walk for 6 hours of an 8-hour workday with normal breaks"; can "sit for 6 hours of an 8-hour workday with normal breaks"; and has no restrictions in use of her hands or feet. Id. at 508-10.

## C.   Plaintiff's Pre-Hearing Allegations

In a Pain Questionnaire dated January 7, 2011, Plaintiff stated she began suffering from neck pain after a car accident in 1988 and falling on her tail bone in 1991. Id. at 180.

In a Function Report from the same date, Plaintiff stated she cooks three times a week, and that if the cooking takes longer than 45 minutes, she needs to take breaks. Id. at 170. Plaintiff stated she does not "do any outdoor chores," but does perform light cleaning. Id. Plaintiff stated she no longer cleans as long as she used to. Id. Plaintiff stated she needs help lifting laundry baskets. Id. Plaintiff stated she drives "at times," and that she shops for groceries twice a month for an hour at a time. Id. at 171. Plaintiff stated she also goes to stores to shop for clothes and necessities. Id.

Plaintiff stated she takes care of her family when she can, but "it seems they take more care of me." Id. at 172. Plaintiff stated her husband and children take care of the family pets. Id. Plaintiff stated that before her physical condition deteriorated, she was able to play volleyball and basketball; "run after" her nephews and nieces; cook big meals; and "watch activities like football." Id. Plaintiff stated her physical condition affects her sleep, causing her to wake up after a few hours "because of back pain," which makes her feel "tired in the morning." Id. Plaintiff stated "the only time" she has problems showering, using the bathroom, or dressing is when her "sciatica acts up." Id. Plaintiff stated that, when her sciatica "gets severe," she needs "help up from my bed" and a "walker to get to bathroom." Id.

Plaintiff stated she does not "really go anywhere unless it's to take my daughter to school, grocery shop, visit when I can." Id. at 173. Plaintiff stated she gets along well with authority figures, and has never been fired because of problems getting along with other people. Id. at 174. Plaintiff stated she still has "trouble accepting there are things I just can't do." Id. Plaintiff stated she uses a walker and brace that were prescribed by a doctor after her surgery in 2000. Id. Plaintiff stated she uses the brace "every day off/on through the day," and the walker "only when sciatica is very bad." Id. Plaintiff stated she does not "have any social activities since [her] illness worsened." Id. at 175.

Plaintiff stated she cannot lift over ten pounds or she will hurt her back. Id. She stated she cannot stand for more than ten minutes; can only walk up to twenty minutes before needing to rest; has difficulty squatting, bending, and kneeling; and her concentration goes when she is overwhelmed with pain or depression. Id. Plaintiff stated she follows written and spoken instructions "pretty good." Id. In a section of the Function Report for additional remarks, Plaintiff wrote: "I just want to apologize for the delay. After receiving this form I was sick with the flu for a week, then my fibro and back pain was bad and I was I guess in a depressed mode. I didn't realize the time frame." Id. at 176.

**D.    Third-Party Statements**

In a series of letters, Plaintiff's relatives, acquaintances, and former manager wrote about their observations of Plaintiff. Plaintiff's brother wrote: "There are times when I call [Plaintiff] to see how she is doing & I can tell from the tone of her voice that she is in pain. . .  [I] know that the rest of my family feels the same way, especially her Husband Bernie & her kids that see her dealing with this every day." Id. at 240. A Divisional Manager at Plaintiff's former job wrote:

> "Sally Uribe was terminated on December 12, 2006 after she was deemed incapable of coming into work to fulfill her position. She was unable to commit to any work schedule because of her constant pain. . . .  She was gone from work off and on due to her severe pain

> issues.  She would often come into the office and then would need to leave because she was in too much pain.  This regularly occurred for about 1 year.  Her doctors could not diagnose her problem other than chronic pain and she had no apparent physical condition that they could pin point the problem on. . . .  Prior to this condition, Mrs. Uribe was a very good worker, always reliable and dependable.

Id. at 242.

Plaintiff's sister-in-law wrote:

> The past several years I noticed a drastic change in Aracelia, her inability to be flexible and mobile was becoming very noticeable and the pain she described was heart breaking to us.  I could tell she was in pain and not comfortable to the point where she was no longer coming to family functions.  We were told she was in too much pain and it would be best if she stayed home.

Id. at 245.

Plaintiff's parents-in-law wrote that she "struggles to walk, sit or even stand."  Id. at 246.  Plaintiff's sister wrote:  "Every time I see her or speak to her she is crying because she is in so much pain."  Id. at 248.  Plaintiff's older brother wrote he had seen Plaintiff "not be able to get up from her bed because of sciatica pain."  Id. at 250. Plaintiff's neighbor wrote that Plaintiff complained frequently of being in pain, and that she "could see it was unbearable at times."  Id. at 251.

In a letter dated March 1, 2012, Plaintiff's 23-year-old daughter wrote:

> As far as I can remember, my mom has always had problems with her upper-back, lower-back, shoulders, neck, fibromyalgia, and sciatica. I remember when I was younger, I would always see her in pain, and spent a lot of time in bed. . . .  There are times she can't get out of bed, or even walk. . . .  My dad and I sometimes try massaging her, but it doesn't really help.

Id. at 252.

**E.     ALJ Hearings**

**1.     Hearing on March 4, 2012**

On March 14, 2012, a hearing was held before the ALJ.  Id. at 25.  Plaintiff was represented by counsel.  Id.  Plaintiff stated she was "let go" in December 2006 from her

8

job because "it was harder for me to come into work.  I was missing a lot of work."  Id. at 35.  Plaintiff was asked whether her pain was "worse now than it was in '06."  Id. at 44. Plaintiff answered:  "The last couple of years that I haven't had any medical attention, yes, it's gotten a lot worse."  Id. at 44-45.

The ALJ asked Plaintiff whether she needs a cane when she walks.  Id. at 41. Plaintiff answered, "When I do have to [walk] I always take my cane."  Id.  Plaintiff showed the ALJ her single-point cane, which she said was originally her father's.  Id. Plaintiff then reiterated she needs the cane to walk; otherwise, she "can't walk at all."  Id.

Plaintiff testified that her physical condition deteriorated as a result of a car accident and another accident in which she "fell through" her backyard deck.  Id. at 45-46.  The ALJ asked Plaintiff whether she received any medical care after either accident, and Plaintiff answered no.  Id.

At the conclusion of the hearing, the ALJ noted there were "very little treatment records," and decided to have Plaintiff receive a "neuro CE" to "see what we get from that."  Id. at 51.  The ALJ said, "And then we'll come back and address that, all right?" Id.  Plaintiff's counsel consented.  Id.

### 2.    Hearing on June 12, 2012

After Dr. Maze evaluated Plaintiff, a followup hearing before the ALJ was held on June 12, 2012.  Id. at 53.  At that hearing, the ALJ asked a vocational expert whether "a hypothetical person of the claimant's age, education and work history," with "[o]ccasional postural limitations, occasional overhead reach; no climbing of ladders, ropes, scaffolds; and, no heights or hazards" could do Plaintiff's previous work as an "accounts payable receivable" clerk or supervisor.  Id. at 56.  The vocational expert answered that such a person could do all of Plaintiff's previous work.  Id.  The ALJ then asked Plaintiff's counsel whether she wished to ask "[a]ny questions," and Plaintiff's counsel answered no.  Id. at 57.

# III.

## STANDARD FOR EVALUATING DISABILITY

In order to qualify for DIB or SSI, a claimant must demonstrate a medically determinable physical or mental impairment that (1) prevents him from engaging in substantial gainful activity and (2) is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

To decide if a claimant is disabled, and therefore entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)    Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2)    Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3)    Does the claimant's impairment meet or equal one of the specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found disabled. If not, proceed to step four.[2]

(4)    Is the claimant capable of performing work she has done in the past? If so, the claimant is found not disabled. If not, proceed to step five.

(5)    Is the claimant able to do any other work? If not, the claimant is found

---

[2] "Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's [residual functional capacity]." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1222-23 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(e)). In determining a claimant's residual functional capacity, an ALJ must consider all relevant evidence in the record. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006). This involves, inter alia, evaluating the credibility of a claimant's testimony regarding her capabilities. Chaudhry v. Astrue, 688 F.3d 661, 670 (9th Cir. 2012).

10

1  disabled.  If so, the claimant is found not disabled.

2  <u>Tackett</u>, 180 F.3d at 1098-99; <u>see also</u> <u>Bustamante v. Massanari</u>, 262 F.3d 949, 953-54

3  (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

4  The claimant has the burden of proof at steps one through four, and the

5  Commissioner has the burden of proof at step five.  <u>Bustamante</u>, 262 F.3d at 953-54.

6  Additionally, the ALJ has an affirmative duty to assist the claimant in developing the

7  record at every step of the inquiry.  <u>Id.</u> at 954.  If, at step four, the claimant meets her

8  burden of establishing an inability to perform past work, the Commissioner must show

9  that the claimant can perform some other work that exists in "significant numbers" in the

10  national economy, taking into account the claimant's residual functional capacity

11  ("RFC"), age, education, and work experience.  <u>Tackett</u>, 180 F.3d at 1098, 1100;

12  <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

13

14  **IV.**

15  **THE ALJ'S DECISION**

16  **A.    Step One**

17  At step one, the ALJ found Plaintiff "did not engage in substantial gainful activity

18  during the period from her alleged onset date of December 20, 2006 through her date last

19  insured of December 31, 2011."  AR at 12 (citations omitted).

20

21  **B.    Step Two**

22  At step two, the ALJ found:  "Through the date last insured, the claimant had the

23  following severe impairments:  mild degenerative disc disease at L5-S1, cervical

24  multilevel degenerative disc disease, and fibromyalgia."  <u>Id.</u> (citations omitted).  The

25  ALJ found Plaintiff's alleged mental impairments non-severe.  <u>Id.</u> at 12-13.

26

27  **C.    Step Three**

28  At step three, the ALJ found:  "Through the date last insured, the claimant did not

have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." Id. at 13 (citations omitted).

## D.   RFC Determination

The ALJ stated: "After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except that the claimant could perform postural activities occasionally, could perform overhead reaching occasionally, could not climb ladders, ropes or scaffolds, and could not work around heights or hazards." Id. at 13.

In reaching this RFC determination, the ALJ found "not credible" Plaintiff's claim "that she could not work due to neck pain, shoulder pain, back pain, and sciatic pain." Id. at 14; see also id. ("[T]he claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."). The ALJ summarized the reasons for his credibility finding as follows:

> The claimant's credibility is at variance with the weight of the evidence. First, two consultative examiners examined the claimant and found only minimal clinical findings (Exhibit 5F, 10F). Based on objective testing and examination, they both opined that the claimant could perform a range of medium work. Second, the objective medical evidence does not substantiate the claimant's allegations of debilitating pain (Exhibit 1F/13-16, 3F/12, 3F/53-54, 3F/66). Third, the claimant's reported pain levels were not consistent with her allegations of disabling pain. In October 2006, the claimant's pain level in the neck was 4-5/10, in the mid back was 5/10, and in the low back was 5/10 (Exhibit 1F/16). Fourth, there is a significant gap in treatment of approximately more than two years from October 2009 to September 2011. The lack of any treatment does not suggest that the claimant was experiencing unrelenting pain. Moreover, the claimant's condition was characterized as *mild* spondylosis, which does not substantiate the claimant's various complaints of incapacitating pain (Exhibit 3F/12). Additionally, the claimant's testimony that she needed a cane is controverted by Dr. Maze's observations (Exhibit 10F) and Dr. Bouz's observations (Exhibit 5F).

1
2
3
4

> Her activities of daily living are also fairly normal (Exhibit 5E). There is no evidence that the claimant requires in-home support services because of her alleged conditions. Although she stated that she had no income, she did not try to seek free medical care. Based on the above factors, the claimant's subjective complaints are not fully plausible.

5

Id. at 16-17.

6
7

In addition, the ALJ gave "little weight" to the statements by Plaintiff's "relatives, co-workers, [and] acquaintances." Id. at 17. The ALJ explained:

8
9
10
11
12

> First and foremost, these statements are given little weight because they are directly contradicted by the objective medical evidence (Exhibit 3F/12, 5F, 10F). These statements conflict with and fail to overcome the probative effect of the medical evidence in this case. Moreover, these third parties can only report their observations of the claimant, which might not be reflective of the claimant's maximal capacities. Furthermore, these third parties seem to accept and rely on the claimant's complaints. However, as stated above, the claimant is not fully credible.

13

Id. at 17.

14
15
16
17

After reviewing Plaintiff's medical history, the ALJ "generally adopt[ed]" the opinions of Dr. Montoya, Dr. Bouz, and Dr. Maze. Id. at 16. The ALJ stated: "All three doctors opined that the claimant could perform a range of medium work. There is no contrary opinion evidence in the record." Id.

18
19

**E.    Step Four**

20
21
22

At step four, the ALJ stated: "Through the date last insured, the claimant was capable of performing past relevant work as an accounts payable/receivable clerk and an accounts payable/receivable supervisor." Id. at 17.

23
24

**F.    Step Five**

25

The ALJ did not analyze step five.

26
27
28

13

## V.

### **PLAINTIFF'S CLAIMS**

Plaintiff asserts nine claims, reproduced *verbatim* as follows:

1. "Evidence does not support ALJ's attack of Plaintiff's credibility."  JS at 3.

2. "Objective findings support subjective complaints for disorders of back. These findings do not support the ALJ's unfavorable decision:  ankylosing spondylitis."  Id. at 10.

3. "Objective findings support subjective complaints for disorders of back. Was treatment sought out for the musculoskeletal condition?"[3]  Id. at 13.

4. "Objective findings support subjective complaints for disorders of back. These findings do not support the ALJ's unfavorable decision: fibromyalgia."  Id. at 15.

5. "Objective findings support subjective complaints for disorders of back. Sciatica was diagnosed."  Id. at 16.

6. "Objective findings support subjective complaints for disorders of back. These findings do not support the ALJ's unfavorable decision:  objective findings are supporting components underlying medical diagnoses and subjective complaints."  Id. at 17.

7. "There was no medical expert at the hearing."  Id. at 19.

8. "Non-treating physicians were given disproportionate weight."  Id. at 21.

9. "ALJ did not provide a full range of hypotheticals."  Id. at 23.

## VI.

### **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's

---

[3] As this claim shows, Plaintiff's arguments are often unclear.  The Court has done its best to decipher and respond to them.

14

1  decision to deny benefits.  This Court "may set aside a denial of benefits if it is not

2  supported by substantial evidence or it is based on legal error."  <u>Pinto v. Massanari</u>, 249

3  F.3d 840, 844 (9th Cir. 2001) (citation and internal quotation marks omitted).

4      "Substantial evidence" is evidence a reasonable person might accept as adequate

5  to support a conclusion.  <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).  It

6  is more than a scintilla but less than a preponderance.  <u>Id.</u>  To determine whether

7  substantial evidence supports a finding, the reviewing court "must review the

8  administrative record as a whole, weighing both the evidence that supports and the

9  evidence that detracts from the Commissioner's conclusion."  <u>Reddick v. Chater</u>, 157

10  F.3d 715, 720 (9th Cir. 1998); <u>see also</u> <u>Hill v. Astrue</u>, 698 F.3d 1153, 1159 (9th Cir.

11  2012) (stating that a reviewing court "may not affirm simply by isolating a specific

12  quantum of supporting evidence") (citations and internal quotation marks omitted).  "If

13  the evidence can reasonably support either affirming or reversing," the reviewing court

14  "may not substitute its judgment" for that of the Commissioner.  <u>Reddick</u>, 157 F.3d at

15  720-21; <u>see also</u> <u>Molina v. Astrue</u>, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the

16  evidence is susceptible to more than one rational interpretation, we must uphold the

17  ALJ's findings if they are supported by inferences reasonably drawn from the record.").

18      The Court may review only the reasons stated by the ALJ in his decision "and may

19  not affirm the ALJ on a ground upon which he did not rely."  <u>Orn v. Astrue</u>, 495 F.3d

20  625, 630 (9th Cir. 2007).  If the ALJ erred, the error may only be considered harmless if

21  it is "clear from the record" that the error was "inconsequential to the ultimate

22  nondisability determination."  <u>Robbins</u>, 466 F.3d at 885 (citation and internal quotation

23  marks omitted).

24  ///

25  ///

26  ///

27  ///

28  ///

1

**VII.**

2

**DISCUSSION**

3

**A.    The ALJ's Credibility Determination Was Not Erroneous.**

4

**1.    Background**

5

Plaintiff challenges the ALJ's determination that Plaintiff "is not fully credible."

6

AR at 17.  Plaintiff argues this determination is contradicted by (1) Plaintiff's "work

7

record from 1987 to 2006"; (2) Plaintiff's manager's statement that she was "a very good

8

worker"; (3) the letters by various third parties who "have clearly witnessed [Plaintiff's]

9

pain and deterioration"; and (4) a consultative examiner's finding that Plaintiff was

10

"fairly credible."  JS at 3-4 (citations omitted).

11

12

**2.    Legal Standard**

13

"In assessing the credibility of a claimant's testimony regarding subjective pain or

14

the intensity of symptoms, the ALJ engages in a two-step analysis."  <u>Molina</u>, 674 F.3d at

15

1112 (citation omitted).  "First, the ALJ must determine whether there is objective

16

medical evidence of an underlying impairment which could reasonably be expected to

17

produce the pain or other symptoms alleged."  <u>Id.</u> (citations and internal quotation marks

18

omitted).  "If the claimant has presented such evidence, and there is no evidence of

19

malingering, then the ALJ must give specific, clear, and convincing reasons in order to

20

reject the claimant's testimony about the severity of the symptoms."  <u>Id.</u> (citations and

21

internal quotation marks omitted).  "At the same time, the ALJ is not required to believe

22

every allegation of disabling pain, or else disability benefits would be available for the

23

asking . . . ."  <u>Id.</u> (citations and internal quotation marks omitted).

24

"In evaluating the claimant's testimony, the ALJ may use ordinary techniques of

25

credibility evaluation."  <u>Id.</u> (citations and internal quotation marks omitted).  "For

26

instance, the ALJ may consider inconsistencies either in the claimant's testimony or

27

between the testimony and the claimant's conduct; unexplained or inadequately

28

explained failure to seek treatment or to follow a prescribed course of treatment; and

16

1  whether the claimant engages in daily activities consistent with the alleged symptoms

2  . . . ."  Id. (citations and internal quotation marks omitted).  "While a claimant need not

3  vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a

4  claimant's testimony when the claimant reports participation in everyday activities

5  indicating capacities that are transferable to a work setting . . . ."  Id. (citations and

6  internal quotation marks omitted).  "Even where those activities suggest some difficulty

7  functioning, they may be grounds for discrediting the claimant's testimony to the extent

8  that they contradict claims of a totally debilitating impairment."  Id. (citations and

9  internal quotation marks omitted).

10  "When evidence reasonably supports either confirming or reversing the ALJ's

11  decision, we may not substitute our judgment for that of the ALJ."  Ghanim v. Colvin,

12  763 F.3d 1154, 1164 (9th Cir. 2014) (citation and internal quotation marks omitted).

13  Even if "the ALJ erred in relying on one of several reasons in support of an adverse

14  credibility determination," the error is considered harmless if "the ALJ's remaining

15  reasoning and ultimate credibility determination were adequately supported by

16  substantial evidence in the record."  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d

17  1155, 1162 (9th Cir. 2008) (citation and emphasis omitted).  "So long as there remains

18  substantial evidence supporting the ALJ's conclusions on credibility and the error does

19  not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed

20  harmless and does not warrant reversal."  Id. (citations, internal quotation marks, and

21  alterations omitted); see also id. at 1163 ("Here, the ALJ's decision finding [the

22  claimant] less than fully credible is valid, despite the [ALJ's] errors . . . .").

23

24  **3.   Application**

25  The ALJ gave "specific, clear, and convincing reasons" for rejecting Plaintiff's

26  claim that she cannot work.  Molina, 674 F.3d at 1112.  After a thorough review of the

27  record, the ALJ concluded Plaintiff's claim of total disability since December 2006 was

28  not fully credible.  See AR at 14-17.  In support of this finding, the ALJ cited, *inter alia*,

1    Dr. Bouz's and Dr. Maze's opinions that Plaintiff could perform a range of medium

2    work; the lack of objective medical evidence to substantiate Plaintiff's allegations of

3    debilitating pain; Plaintiff's relatively low reported pain levels in October 2006,

4    approximately two months before she was let go from her last job; the gap in Plaintiff's

5    treatment from October 2009 to September 2011; Dr. Betts's characterization of

6    Plaintiff's spondylitis as "mild"; and Plaintiff's activities of daily living.  See supra

7    Section IV.D.  The ALJ also noted that both Dr. Bouz and Dr. Maze "controverted"

8    Plaintiff's testimony that she could not walk without a cane.  Id.; compare AR at 41

9    (Plaintiff's testimony) with AR at 481, 509 (doctors' statements that Plaintiff did not

10   have an assistive device and could "walk in a stable manner").

11       Each of the ALJ's considerations was valid.  See, e.g., Molina, 674 F.3d at 1112

12   ("[T]he ALJ may consider inconsistencies either in the claimant's testimony or between

13   the testimony and the claimant's conduct; unexplained or inadequately explained failure

14   to seek treatment or to follow a prescribed course of treatment; and whether the claimant

15   engages in daily activities consistent with the alleged symptoms.");  Verduzco v. Apfel,

16   188 F.3d 1087, 1089 (9th Cir. 1999) ("None of the [claimant's] treating or examining

17   physicians ever indicated that [he] was disabled").  Even assuming one of the

18   considerations was invalid, the ALJ's ultimate credibility finding was supported by

19   substantial evidence.  See Carmickle, 533 F.3d at 1162-63.

20       Plaintiff does not specifically challenge any of the ALJ's considerations.  Rather,

21   to contest the ALJ's ultimate credibility finding, Plaintiff cites various portions of the

22   record that support her case, including the third-party statements submitted on Plaintiff's

23   behalf, a consultative examiner's opinion that Plaintiff was "fairly credible," and

24   Plaintiff's work record.  JS at 3-4.  However, the ALJ correctly found that the third-party

25   statements "conflict with and fail to overcome the probative effect of the medical

26   evidence in this case."  AR at 17.  Moreover, the examiner's opinion that Plaintiff was

27   "*fairly* credible" does not contradict the ALJ's finding that Plaintiff was not "*fully*

28   credible."  Id.  As for Plaintiff's work record, at *most* that factor shows the evidence

1   "reasonably supports either confirming or reversing the ALJ's decision," in which case

2   the decision must be affirmed.  Ghanim, 763 F.3d at 1164.

3

4   **B.**     **The ALJ Did Not Err With Regard to Plaintiff's Alleged Ankylosing**

5         **Spondylitis.**

6       Plaintiff argues the ALJ erred when he "stated that plaintiff 'did not have the

7   classic appearance of ankylosing spondylitis.'" JS at 10 (quoting AR at 14).  Plaintiff

8   has conveniently (and misleadingly) quoted only part of the ALJ's statement.  The ALJ

9   stated:  "In December 2006, diagnostic imaging . . . did not have the classic appearance

10   of ankylosing spondylitis (Exhibit 1F/7-8)."  AR at 14.  The ALJ's statement was

11   completely accurate:  Plaintiff's December 2006 medical report states *verbatim* there was

12   no "classic appearance of ankylosing spondylitis."  Id. at 261.  Thus, the ALJ did not err.

13

14   **C.**     **The ALJ Adequately Considered Plaintiff's Medical Treatment.**

15       Plaintiff appears to argue that the ALJ failed to consider her back surgery in 2000,

16   her treatment for depression, and her epidural injection treatment.  See JS at 14.  In fact,

17   the ALJ was aware of and mentioned all of those factors.  See AR at 13 (noting

18   Plaintiff's mental health treatment); id. at 14 (noting Plaintiff's back surgery); id. at 15

19   (noting Plaintiff's epidural injection treatment).  Thus, the ALJ did not err.

20

21   **D.**     **The ALJ Adequately Considered Plaintiff's Diagnosis of Fibromyalgia.**

22       Plaintiff argues her fibromyalgia diagnosis provides "evidence that underlies the

23   plaintiff's complaints of pain."  JS at 15.  This argument does not contradict the ALJ's

24   analysis.  At step two, the ALJ found Plaintiff's fibromyalgia to be a severe impairment.

25   AR at 12.  Then, in assessing Plaintiff's RFC, the ALJ found Plaintiff's impairments

26   could "cause [Plaintiff's] alleged symptoms."  Id. at 14.  However, as already discussed,

27   the ALJ found Plaintiff's alleged symptoms not fully credible.  See supra Section VII.A.

28   To the extent Plaintiff argues her fibromyalgia diagnosis invalidates the ALJ's credibility

1  determination, that argument is without merit.  See id.

2

3  **E.    The ALJ Did Not Err with Respect to Plaintiff's Sciatica.**

4       Plaintiff's entire argument in her fifth claim is:  "The sciatica, combined with the

5  AS and fibromyalgia[,] cannot be accommodated by limiting plaintiff to medium work."

6  JS at 17.  Plaintiff does not bother to explain *how* her sciatica conflicts with the ALJ's

7  assessment that she can perform medium work.  As the Agency notes, Plaintiff has

8  "point[ed] out no discernible error."  Id. at 16.

9       Out of an abundance of caution, the Court has reviewed the ALJ's opinion for any

10  error with respect to Plaintiff's sciatica, and has failed to detect any.  The ALJ twice

11  noted Plaintiff's diagnosis with sciatica, and classified her degenerative disc diseases –

12  which cause sciatica – as severe impairments.  AR at 12, 16; see also Cleveland Clinic,

13  "What is Sciatica?,"

14  http://my.clevelandclinic.org/health/diseases_conditions/hic_What_is_Sciatica.  Thus,

15  the ALJ did not err.

16

17  **F.    Plaintiff's Sixth Claim Raises No Discernible Error.**

18       Plaintiff's sixth claim reads as follows:  "Objective findings support subjective

19  complaints for disorders of back.  These findings do not support the ALJ's unfavorable

20  decision:  objective findings are supporting components underlying medical diagnoses

21  and subjective complaints."  Id. at 17.  Plaintiff cites a number of tests and diagnoses she

22  received, then states:  "Any nexus among these tests, diagnostic and clinic treatment and

23  the subjective suffering of plaintiff was not considered to the extent it warranted both by

24  the ALJ and in appropriate hypotheticals presented to the vocational expert."  Id. at 18.

25       Plaintiff's claim is unclear.  Once again, the Agency states "Plaintiff points to no

26  discernible error."  Id.  To the extent Plaintiff argues certain evidence invalidates the

27  ALJ's credibility finding, that argument is without merit.  See supra Section VII.A.  To

28  the extent Plaintiff argues the ALJ presented an incomplete hypothetical question to the

1    vocational expert, Plaintiff fails to explain how the question was incomplete.  Moreover,

2    Plaintiff's hearing attorney did not object to the ALJ's hypothetical question, and did not

3    take the opportunity she was given to ask the vocational expert any hypothetical

4    questions.  See Solorzano v. Astrue, No. 5:11-cv-369-PJW, 2012 WL 84527, at *6 (C.D.

5    Cal. 2012) ("Counsel are not supposed to be potted plants at administrative hearings.

6    They have an obligation to take an active role and to raise issues that may impact the

7    ALJ's decision while the hearing is proceeding so that they can be addressed.").  Thus,

8    whatever Plaintiff's argument may be, it is meritless.

9

10   **G.    The ALJ Did Not Err by Not Having a Medical Expert at the Hearing.**

11         Plaintiff argues the ALJ erred because "he did not have a medical expert" at the

12   hearing.  JS at 19.  An ALJ is only required to call a medical expert if the record is

13   unclear regarding an issue with which the expert could provide assistance.  See

14   Armstrong v. Comm'r of Soc. Sec. Admin., 160 F.3d 587, 589 (9th Cir. 1998).  Here,

15   Plaintiff does not specify what, if anything, was unclear in the record.  Rather, Plaintiff

16   argues the ALJ could not possibly have understood Plaintiff's "esoteric lab work" or

17   other "medical information."  JS at 20-21.  This argument is vague and unpersuasive.

18   Thus, the ALJ did not err.

19

20   **H.    The ALJ Did Not Give Disproportionate Weight to Non-Treating Sources.**

21         Plaintiff argues the ALJ gave disproportionate weight to the opinions of Dr. Bouz,

22   Dr. Maze, and Dr. Montoya, all of whom concluded Plaintiff could perform a range of

23   medium work.  JS at 21.  Plaintiff argues the ALJ should have "favor[ed]" the opinions

24   of Plaintiff's treating physicians over the opinions of Drs. Bouz, Maze, and Montoya.

25   Id.  However, Plaintiff does not cite any contrary opinion from treating physicians that

26   the ALJ should have "favor[ed]."  Indeed, Plaintiff acknowledges her treating physicians

27   provided *no* opinion on "whether [she] could work."  Id.  Thus, there was no treating

28   physician opinion for the ALJ to "favor," and he did not err by relying on the opinions of

1  Drs. Bouz, Maze, and Montoya.

2

3  **I.     The ALJ Did Not Err in Presenting Hypothetical Questions to the Vocational**
4  **Expert.**

5          Plaintiff argues the ALJ erred in presenting hypothetical questions to the
6  vocational expert.  Id. at 23.  Plaintiff argues the ALJ ignored "a substantial body of
7  medical evidence that supports a broader range of hypotheticals."  Id. at 24.  Plaintiff
8  states the ALJ should have presented "a hypothetical considering pain and its limiting of
9  ability to work and the percentage of time the pain kept plaintiff from working."  Id. at
10  23.

11          As already stated, Plaintiff's hearing attorney did not object to the ALJ's
12  hypothetical question, or take the opportunity she was given to ask the vocational expert
13  any hypothetical questions.  See supra Section VII.F.  In addition, Plaintiff does not cite
14  any evidence in the record that demonstrates the specific percentage of time her pain
15  would keep her from working.  Thus, even if the ALJ or Plaintiff's hearing attorney had
16  asked the proposed hypothetical, it is not clear what "percentage" they would have
17  presented to the vocational expert.  Plaintiff's argument is vague and unsubstantiated.
18  The ALJ's hypothetical question to the vocational expert was not erroneous.

19

20                                      **VIII.**
21                                   **CONCLUSION**

22          IT IS THEREFORE ORDERED that judgment be entered AFFIRMING the
23  decision of the Commissioner.

24

25  DATED:  December 29, 2014
26                                   HON. KENLY KIYA KATO
                                     United States Magistrate Judge
27

28

                                        22